Birciiard, C. J.
The questions presented by this bill of exceptions are of deep interest, not only to the profession, but to the whole community, and involve much matter that demands a calm, careful, and serious consideration. No vexed question that was ever agitated since the formation of our state government has elicited a more general and deep interest than has the subject upon which we are now called *to pass our Judgment. It is one that has elicited the best efforts of many of the most eminent in the profession, and perhaps it is not going to far to say that it has awakened the attention, and enlisted upon one side or the other the opinions of nearly every member of the Ohio bar. A subject thus engrossing in its character must, of necessity, present matter difficult and intricate, and can not have thus grown upon the public mind without s<3me great cause. Were it as easy to determine, under all the circumstances of difficulty which surround the subject, what is proper and right to be done, as to point out the causes which have awakened this general interest, our task would be plain, and our duty too palpable to admit of error in performing it.
It is very proper to give a brief statement of these causes in this connection. Prom the first organization of the territorial government down to the year 1835, the citizens of Ohio, the jurists, professional men, and magistrates, with scarce an exception, supposed and believed that a deed executed as this was, passed at law and equity a good and valid estate from the grantor to the grantee. Thousands held lands by such title deeds, and they felt secure and dreamed of nothing that could strip them of their titles or endanger their property. At this date came the decision in Connell v. Connell, and if it was law, and there was no relief against the doctrines of-that case, it was at once foreseen that the common error that many magistrates, and judges, and lawyers, had committed in certifying the acknowledgment of married women, must produce wide-spread mischief and ruin. At that *505 juncture the legislature, pursuant to the suggestion of some, if not all three of the judges who pronounced that decision, promptly enacted the law of March 9, 1835, supposing it to be a proper exercise of their legislative power. They attempted by that means to remedy the inartificial ministerial acts of officers in certifying the acknowledgment of a class of deeds which ail the elder jurists had always considered good. This act quieted the public mind, received the public approbation, and for eight years was sustained *by ail the inferior courts, and sanctioned by repeated decisions of the Supreme Court upon the circuit. But in 1843, in Good v. Zercher, and Meddock v. Williams, this court, under its solemn conviction of duty, felt bound to pronounce the act of 1835 an infraction of the constitution, and therefore void, and also to reaffirm the principles of the decision in Connell v. Connell. For the next two years these decisions were acted upon in parts of the state, and in some counties many suits were instituted to disturb ancient possessions. This state of things has made the question one of great interest.
With these preliminary remarks, I proceed to consider the points to be determined. This deed was executed while the act of January 30, 1818, was in force (2 Chase, 1041), and to test its validity we must look to its provisions. Section 2 declares that when the estaje of the wife is to bo conveyed, the deed “ shall be signed and sealed by the husband and wife, and the signing and sealing bo acknowledged by them in the presence of two subscribing witnesses, who shall attest the acknowledgment of such signing and sealing, and also be acknowledged before, a . . . justice of the peace, and the . . . justice taking such acknowledgment shall examine the wife separate and apart from her said husband, and shall read or otherwise make known to her the contents of such deed, and if upon such examination she shall declare that she voluntarily, and of her own free will and accord, without any fear or coercion of her husband, did and now doth acknowledge the signing and sealing thereof, the justice shall certify the same, together with the acknowledgment of the husband on the same sheet, subscribing his name and affixing his seal to said certificate.”
Tho objects, of these provisions gre manifest: 1. To secure the wife against imposition; and, 2. To prevent coercion. To guard against the fraud of third parties, the husband is required to bo *506 present, in order that she may have the aid and counsel of him who should be, and in general is, her natural and most reliable protector and counselor. To guard against any possibility of unfairness, fraud, coercion, *or neglect of duty on his part, the justice is required to examine her separate from her husband, and to inform her of the contents of the instrument, to make her understand it, and finally, to secure her freedom of action, she is, separate and apart from her husband, to make her declaration of freedom from coercion, and of acknowledgment, which declaration, etc., the justice was to certify, with the husband’s acknowledgment on the same sheet. “If upon such examination she shall declare," etc., the justice shall certify the same. Tried by the ordinary rules of testing the meaning of language, and the word same here refers only to the declaration of the wife and to the act of acknowledgment by her. Such examination means the examination required to be made in the absence of, “ separate and apart from," her husband. This, in our opinion, is the true grammatical construction of this part of the section. At all events, it is by no means certain that the phraseology will not bear this construction. It has for its support the usage of the most skillful conveyancers contemporaneous with the statute, and that is a consideration of great force, one that in most cases should control, and in no case should be departed from without the most cogent reasons. McKean v. DeLancy, Lessee, 5 Cranch, 29; Troup v. Haight, 1 Hopk. 267; Jackson v. Gilchrist, 15 Johns. 89; 2 Inst. 28. We believe it is a fair exposition of the object the legislature had in view, and all that the act made necessary. Stevens v. Doe ex dem. Henry, 6 Blackf. 475, is in point. The object of the separate examination of the wife being in part to enable the officer to make known to her the contents and legal effect of the deed upon her rights, it being necessary that he should bo satisfied that this object has been attained before he could lawfully take and certify her acknowledgments, it is manifest that the means he must employ would require to be varied to accommodate the capacity or condition of the grantor. These words, “ otherwise make known,” are directory, mandatory, and vei’y comprehensive, admitting and requiring the employment of all the means of communicating knowledge that the necessity of any case *might require. In many cases the private examination would fail entirely in accomplishing tko object of the law without the intervention of an *507 interpreter. No form for certifying the examination is prescribed. The nature of the officer’s duty is such that neither-the legislature nor an intelligent lawyer would ever attempt to furnish a form that would meet all cases and answer the object in view, if the statute in fact contemplated a certificate of the facts done, and explanations given, so full that the courts in after-times can judgo whether the requisitions of the act in this respect were complied with, as was held by a majority of the court in Meddock v. Williams, 12 Ohio. Upon such a construction we should repeat what was well said by Judge Burnett, in Brown v. Farran : “If this is the true construction it is not probable that a legal certificate of acknowledgment can be found, or was ever made in this state.” The magistrate’s certificate that he read the deed is not sufficient to answer the objects of the law under such a construction. Read-, ing the deed may or may not have made the wife acquainted with the contents of it. If of German, Welsh, French, or any foreign extraction unacquainted with the English language, reading of the deed to her would have been a mere farce without the aid of an interpreter. It would have been a fraud upon the woman and a fraud committed against the spirit of the law. And again, how could any one judge that in the case supposed, with the aid of an interpreter, the contents of the deed were made known, unless it appeared from the certificate that the interpreter was sworn, and what he did and said, and how he interpreted into the foreign language the contents of an English deed of conveyance.
This view of the subject need not be dwelt upon in order to prove that the legislature contemplated relying upon the official oath of the officer, for his faithful performance of the portion of the statute which is directory to him, or to prove that they did not mean to require a full statement of the means by which he had made known to the feme covert the contents of a deed.
*The Supreme Court of Indiana, in construing a similar statute of that state, says : “It is the officer’s duty, by this statute, before he takes the acknowledgment of a feme covert, to examine her apart from her husband, and make known to her the contents of the deed; and if, upon such examination, she declared, either expressly or in language implying it, that she had executed the deed voluntarily, etc., .the officer must, under his hand and seal, and on the deed, certify the same; that is, he must certify on the deed that such declaration or acknowledgment of the voluntary *508 execution of tho deed was made before liim. But tho statute does not require, as we understand it, the certificate to show anything more on the subject than the declaration or acknowledgment of tho wife that she had voluntarily executed the deed. It will be presumed, the contrary not appearing, that the officer did his duty as to tho separate examination of the wife, and the making her acquainted with the contents of the deed. It is the acknowledgment only, not the circumstances under which it was made, that is required to be certified.” 6 Blackf. 475.
This accords with the early decisions in Ohio. So under our statute, if, in tho officer’s judgment upon the separate examination which he is directed to make, the contents of the deed have been made known, he must take and certify her acknowledgment, and that of her husband, on the same sheet. No good purpose could have been served by requiring a detailed statement of the facts done in communicating information to the wife, so full that a court in after-times could- say with certainty that she know the Contents of the deed. On tho contrary, many evils must have come from such a practice; no one would have felt safe in trusting any but tho most accomplished and skillful in the profession to draw up such a certificate; and had the general assembly contemplated anything of the kind, wo should not now find within the lids of the statute, an authority conferred upon a large class of officers to take acknowledgments, thousands -of whom they must have known to be incompetent to perform % duty so precise. But again, why require a certificate under the officer’s hand and seal of his own performance of duty? It would not give any strength to the legal presumption, based upon his oath of office. His official oath would be violated by taking and certifying the acknowledgment while the wife was ignorant of the contents; and surely jf his official oath can not be trusted, his certificate would be utterly worthless.
Tho sensible answer to these objections is, that the true construction of the act does not require a certificate that the contents wore made known before or at the time of the acknowledgment.
Wo come next to consider the reported decisions adverse to this construction of the statute. Tho first in point of time is Connell v. Connell, 6 Ohio, 358, determined by throe judges only, at the December term, 1835, under tho statute of 1805, which statute, in this respect, is substantially like the act of 1818, and all the other *509 statutes on the same subject. The deed, in that case, bore date in 1812, and the acknowledgment is substantially like the one under considei’ation. It was held insufficient under the decision supposed to have been made in Brown v. Farran, 3 Ohio, 140. On examining the case it will be seen that no question arose in Brown v. Farran, concerning the necessity of a certificate of the magistrate that the contents of the deed were made known to tho wife. The point decided was, as given by the reporter, that “a certificate of relinquishment of dower is sufficient, if it contain a substantial enumeration of the acts required by the statute, though the words be not followed, and that an inveterate practice for a series of years was not to bo departed from.” That case arose under the act of 1818, and the deed was adjudged good upon two grounds.
The second ground deserves passing notice. ■ The learned counsel who has furnished us an elaborate printed argument against the proposition, was counsel of one of the parties in Brown v. Farran. An abstract of his argument will be found on pages 146 to 148, inclusive. He there stated *that the practice of taking the acknowledgments of deeds in that form had been uniform over since tho first settlement of the Miami country, and he contended that “ if the community had been in error for thirty years it was better the error should be consecrated by the court, than that they should make a decision which would open the door for general litigation.” It appears, also, that he took pains, by procuring the recorder’s certificates, to prove to the court that two-thirds of all the deeds of Hamilton county, prior to 1820, were either no better or worse than that. It is known to us that Hamilton county was no exception to the general practice. In reference to this view of that case the court then said, “No law can require the correction of and error in its construction, which has long existed, and has been generally acquiesced in” “If it had been tho opinion of the court that the words of the statute ought to bo literally copied, and that such should have been the course from the beginning, they would have resorted to the maxim, communis error facit jus, rather than encounter the consequences of shaking the title to an indefinite portion of the state.” What was thus said can be sustained as a safe and sound rule of action, and in departing from it, in Connell v. Connell, and following a dictum of the judge on a point not made or argued in that case, we think there was error, even if the dictum itself was not erroneous.
*510 But let us consider the effect of the act of March 9, 1835. The necessity for the law arose from the facts already stated. The force of that necessity was truly and strongly presented by the argument of the learned counsel, and mado apparent to this court in the year 1827. The facts which transpired between 1827 and 1835, before referred to, wore additional reasons why thoso ancient titles should bo hold good. The time which has elapsed since 1827 has not impaired the force of arguments which were then held sufficient to justify and require this court to sustain the contemporaneous construction evidenced by usage. Instead of impairing, it has added to their strength. What this court then said it would sanction if necessary, upon the principle *of communis error, the general assembly, by this law, has sanctioned. What wrong has been done? Let us recall to mind the state of facts upon which the legislature have acted. It is a harsh thing to declare the act a violation of the constitution, which every member had solemnly sworn he would support. We ought to be well satisfied of the fact, before we venture to pronounce it. Wherein did the legislature depart from duty in enacting the law of 1835? The facts must point to the wrong, if it exists.
By the general assent of the people of the state, and by prior adjudications, deeds had been considered valid to pass the interest of a married woman, without its appearing, from the certificate of the officer, that he had made known to her their contents. The legislature evidently did not think it was required. The state courts had so held, or at least had treated the deed as good, notwithstanding the supposed defect. But the decision of the highest court was then, for the first time, against the validity of such deeds in one case, and one only. Was it proper to interfere? Did the peace, and quiet, and welfare of community require that they should interpose to settle this matter of doubtful construction, or to do that which was equivalent? The legislature thought the act was required, and so do we. The act, in terms, assumes that the deeds were and had been good, but yet that they contained a defect fatal to their admission, to prove title before the court as then constituted, without further legislation’. This is manifest from the words of the act. It reads thus (Swan, 269): “ Any deed heretofore executed pursuant to laic, by husband and wife, shall be received in evidence, in any of the courts of this state, as conveying the estate of the wife, although the magistrate taking the acknowledge *511 ment of such deed, shall not have certified that he read or made known the contents of such deed, before or at the time she acknowledged the execution thereof.”
The deeds intended to bo affected by this statute are here treated as good and subsisting titles, such as had been executed pursuant to law. This language is certainly not such as *would have been used had it been supposed that the construction given in Connell v. Connell was a true interpretation of the acts of 1818 and 1820, and the prior statutes. It is the language proper to be used, supposing our construction and the contemporaneous construction evidenced by usage, to bo the correct one. Hence it is not just to impute a design, on the part of the legislature, to transfer property by their own act, or to impute a disregard of the constitution to those who support the act. It was held, however, in Good v. Zereher, that the law was void, because, if it had any effect, its operation was to divest vested rights. If this wore its true character, no one could sustain it. It would receive no countenance anywhere—much less from any member of this court. It purports, however, to do no such thing. Such was neither its object nor effect. It confirmed, by declaring them valid, deeds which were merely doubtful. It was not avoid law, because it quieted in law a question which was like to be vexatious. It came in aid of vendors, in perfecting their conveyances. It assured grantors that they could not be allowed to take advantage of a doubtful, technical, and merely formal matter, under a single decision of doubtful authority, to reclaim property fairly parted with for full value. It is said, in substance, to the dishonest grantor, you shall hereafter act honestly. “It gave effect,” says Judge McLean (3 McLean, 231), “to the intention of the parties, by relieving from, a mere informality.”
There is another and stronger view of this case, which the authorities cited would fully sustain. But it is needless to restate it at length. In the ease of Good v. Zercher, and Silliman v. Cummins, the dissenting judge, standing in a position which seemed to render any other course improper, felt himself bound to regard the case of Connell v. Connell as a true exposition of the statute, and was, therefore, necessarily compelled to defend his position on the curative act alone. In that opinion, and the views therein stated, the majority of the court fully concur. The numerous authorities then and now cited more than sustain it, *512 and some of *them go further than we have any occasion to go in this case, in sustaining retrospective acts. That opinion stands upon tho ground, that the act operates only on that class of deeds where enough had been done to show' that a court of chancery ought, in each case, to render a decree for a conveyance, assuming that tho certificate was not such as the law required. And that where a title in equity was such that a court of chancery ought to interfere and decree a good legal title, it was within the power of the legislature to confirm the deed, without subjecting an indefinite number to the useless expense of unnecessary litigation.
It was then, and has'sinco been said that it violated the constitutional provision prohibiting the enactment of any law impairing the obligation of a contract. This argument was effectively put down by the decision of the Supremo Court of the United States, in 8 Wheaton.
It is further objected that the act, if allowed to operate retrospectively, is an assumption of judicial power. If we thought so, we would denounce it. The judicial power of the state can not be encroached upon by tho legislative department. It may furnish remedies, but the courts alone can enforce them. But the argument does not sustain the objection. The effect of tho judicial decision in Connell’s case is not touched by the act. The court then ruled that the supposed defective deed was not evidence of title, and that it was defective. The act gives a new rule, and makes such deeds evidence of title in all future causes, provided the deeds had been executed pursuant to law. The difference between the learned counsel and the general assembly, is this: the latter took a distinction between the execution of the deed by a grantor, and the certificate of acknowledgment by the officer; while the counsel take no such distinction. Tho act of the legislature loaves open tho question as to the due execution of the deeds, acting only upon the supposed informality of the certificate. It imparts no vitality to any right not flowing from the acts of the grantor, which the act of 1835 recognized to the letter. Such deeds are assailablo in the judicial ^tribunals, the same as those executed and certified in the most approved form. Like the latter, they may be attacked either at law or in chancery, if in fact the wife was defrauded. If the contents of the deed wero not made known, if she was coerced, or if she did not, in fact, make her *513 acknowledgment in the manner prescribed in the statute, the false but formal certificate of an officer would not deprive her of her land. Nor would the defective certificate, with the aid of the act of 1835, have any such effect.
It was held by all the members of the court, in the case of Good v. Zercher, that acts of this nature may operate, if confined to legitimate objects. “If (says the judge who pronounced the decision of the majority) one competent to do the act attempts to convey a legal estate, and should by defect of form transfer an equity only, the legislature might cure the defect and convert the equitable into a legal estate, or, in better phrase, unite the two. The legislature may cure the title to property, but can not create it.” 12 Ohio, 368. ¥e are satisfied with this .exposition of the principle, and do not controvert it. But it shows that the act of 1835 is not an assumption of judicial power, because Mrs. Shane was made competent by the statute regulating deeds to convoy, by uniting with her husband. On her part she made the attempt in the full and formal exercise of this power, and on her part did all that was required in the prescribed form; but by a supposed failure of the magistrate, she transferred an equity only.
Now, had an unprotected feme sole, without the aid of any friend, executed her deed, and the magistrate had omitted, through mistake, or other cause, to certify it in due form, she would transfer an equity which the legislature “ might convert into a legal estafe,” and “ cure the title to the property.” And yet it is by a supposed failure of the magistrate’s certificate only, that the legal title of the feme covert did not pass. And it can not be denied, that her grantee has an equity against her, flowing directly from her own act, as binding upon her conscience, and not less substantial in ¡Joint of *fact than is the equity against a feme sole, in a case of defective certificate to her conveyance. The cases are not distinguishable in reason. If the legislature can heal the defect in the one case, they may in the other. If a court of chancery ought to interfere in the one case, so ought it in the other. The fiction of law which merges the legal existence of the wife during coverture, is a more fiction. It does not deprive her of the intellect and soul that God gave her. She is still a moral and intellectual being, the fit companion of man, and morally responsible for her conduct.
The last objection is, that the act encroaches upon the judiciary. *514 The argument to prove this act an assumption of judicial power, assumes, as established, the very point in controversy, that the feme covert had created, by her own act, no equity. That all she had done was a nullity. In this respect it has no novelty. All the arguments that I have ever seen against the curative act, have the same fault. They become perfectly neutral, and prove nothing when deprived of the erroneous assumption. But it has this further fault. It assumes that the deed of the feme covert, defectively certified, is null and no better than a blank, not because there may not have been as strong an equity in conscience as in any other cause, but because it is an equity arising under such peculiar circumstances that the chancery courts have hitherto refused to seize upon and enforce it. The argument is in substance this : The courts refuse to make a new precedent, although justice demands it; but the legislature does what is equivalent in a form peculiar to its own mode of action. Hence, the latter has assumed to exercise the judicial functions of the former. This is not logical. You have exercised a power which we have never exorcised, because we had no precedent; ergo, you have exercised our judicial functions. Strong intellects are sorety pressed when driven to such an argument as this. We leave the case with this final remark. Our constitution is the ark of public safety, and we should jealously guard against any suspicious approaches which threaten an infraction, come from what ^quarter they may; but here the alleged assault is a mere creature of the imagination, and nothing more. ' Judgment reversed.