STERNE ET AL. *v.* FLETCHER AMERICAN COMPANY ET AL.

[No. 25,695.  Filed May 13, 1932.  Rehearing denied October 27, 1932.]

*Floyd J. Mattice* and *Roemler, Carter & Rust,* for appellants.

*Charles Remster, Henry A. Hornbrook, Albert P. Smith, Paul Y. Davis* and *Kurt F. Pantzer,* for appellee, Fletcher American Company, and *L. R. Zoff,* for appellee, Peoples State Bank.

Roll, J.—This action was by complaint in two paragraphs, filed by appellants against appellees to recover $25,000 in money deposited with appellees by appellants in connection with a certain written contract between the appellants and appellees, by the terms of which contract appellees agreed to purchase all the preferred stock of the Medical Arts Realty Company, which association was organized for the purpose of building a seventeen-story office building at Massachusetts Avenue and Ohio Street, in the city of Indianapolis.

The cause was submitted to the court for trial, who, upon request, made a special finding of facts, upon which conclusions of law were stated in favor of appellees and judgment was rendered accordingly.

Appellants rely for reversal upon the action of the court in overruling their motion for a new trial, and its conclusion of law upon the facts found.

From the facts found by the court, it appears that at the time of the transactions here involved and since, appellees were corporations organized under the laws of this state and engaged, among other things, in the business of buying and selling bonds and securities, loaning money and participating in financing business enterprises, both public and private.

That, early in the year 1922 appellants, with the exception of appellant Quinn, together with Edwin R. Kibler and Samuel L. Copeland, undertook to organize a company for the purpose of building an office building to be located on the corner of Massachusetts Avenue and Ohio Street in Indianapolis, to be known as the Medical Arts Building.

That, in order to carry out their purpose, they organized a corporation to be known as the "Medical Arts Realty Company" under and pursuant to an Act of the Legislature of Indiana, passed in 1921. Acts 1921, p. 93.

That the individuals named, in carrying out the organization of such corporation, prepared, signed and acknowledged in duplicate, Articles of Incorporation which conformed to the provisions of Sec. 4 of said act, and provided *inter alia*, that the business to be done by the corporation was to purchase, own, control, manage and operate a certain 99-year leasehold on certain real estate in Indianapolis, to build, control and operate on said real estate an office building and to let the same for rental and other purposes; that the amount of the capital stock was $1,100,000, to be divided into 6,000 shares of preferred stock of the par value of $100 each and 5,000 shares of common stock of the par value of $100 each to be sold at par.

One copy of the Articles of Incorporation was filed with the Secretary of State, and the required fee was paid.

That the incorporators were to act as the nine directors until the first annual meeting of the association. That said Kibler resigned as such director on February 8, 1922, and was on that date succeeded by appellant Quinn, and on March 13, 1922, said Copeland resigned as such director and his resignation was accepted.

That, to erect said building and to carry out the business for which the corporation was organized required a large amount of money, more than appellants had or could furnish, and, as directors, they sought to obtain money by issuing and selling $600,000 preferred stock, and $500,000 common stock of the corporation, and in order to carry out the purpose for which said corporation was to be organized, they secured an option for a 99-year lease on said real estate, and in order to sell both the common and preferred stock, they placed the same upon the market, and the Medical Arts Realty Company entered into a contract with appellees by which appellees undertook, upon the terms stated in the

contract, to purchase all of said preferred stock. The said contract was executed on March 17, 1922, signed by the president and secretary of said Medical Arts Realty Company on behalf of the same under the authority and direction of said Board of Directors; that in said contract, the first party was designated as the "Medical Arts Realty Company," and the second party by their respective corporate names; that as conditions upon which appellees would undertake to sell said preferred stock they required divers things to be done, some of the most important conditions being as follows:

1. Preferred stock of first party to bear dividends at the rate of 6½%, payable quarterly, the first dividend payable October 10, 1922.

2. First parties shall cause the 99-year lease or leases covering the premises upon which they have an option, to-wit: the property situated at the corner of Massachusetts Avenue and Ohio Street in the City of Indianapolis, Indiana, to be taken in the name of first party. Said lease to be in a form approved by second party. Said lease to be submitted to second party, and to show good title in fee simple to said premises in lessor or lessors, free of all encumbrances, other than current taxes.

3. First party to immediately sell to the general public $300,000.00 of its common stock at such price or prices as will net the company at least $255,000.00 and the proceeds thereof to be deposited with the Peoples State Bank on or prior to August 1, 1922. The obligation of second party hereunder is expressly made contingent upon the performance of this agreement by the first party.

4. That not more than $25,000.00 of the proceeds of the sale of the common stock shall be available for purposes other than direct building cost and that at least $230,000.00 thereof shall be available for the sole purpose of paying the direct cost of erecting said building.

5. First party to cause the holders of the majority of the shares of its common stock to execute proxies irrevocable so long as any of said preferred stock is outstanding, authorizing representatives

of second party, whenever and so long as the first party may be thirty days in default in performance of any of its obligations to or agreements with its preferred stockholders, as set out in the preferred stock certificates, to vote such majority of the shares of said common stock upon any and all questions which may come before the stockholders, etc. It was further provided that first party should issue shares of common stock to nine representatives of second party, so that in the event it was necessary or desirable to elect new directors under the exercise of the foregoing proxies, that there would be available shares of stock with which to qualify the parties so elected.

6. A copy of all contracts with architects and all plans and specifications to be deposited with second party.

7. So long as any of said preferred stock is outstanding the first party, (under this paragraph are ten sub-sections, whereby appellees seek to protect its preferred stock after the new building is erected.)

8. First party shall, prior to the time second party is to be obligated to take up the preferred stock, enter into a contract for the erection and completion of the contemplated building and all bills incurred in connection therewith or have bona fide bids therefor, for an amount not to exceed $773,-750.00, all to be approved by second party. All contracts and contractor's bonds to be deposited with second party.

9. Prior to the time second party under the provisions hereof shall become obligated to take up any of such preferred stock, the first party shall make proper showing to second party that it is the absolute owner of such 99-year lease; that the same is unencumbered, that it has complied with all the provisions of such lease precedent to the right to demolish the existing structure thereon.

10. Second party to have the right to employ and place upon the work of erection of said new building, their own expert to see that the work is being properly performed.

11. First party to pay expense in connection with the issuance and stamping the preferred stock, also reasonable compensation of counsel of second

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

party in approving proceeding taken to authorize the issuance of the preferred stock.

12. Contemporaneous with the execution hereof the first party agrees to deposit, or cause to be deposited with the said Peoples State Bank, the sum of $25,000.00 in money, which shall be held as a guaranty for the performance by the first party of the conditions of this agreement which are precedent to the obligation of the second parties hereunder to take up and purchase said preferred stock and which sum is meant to be the purchase price of the commitment of the second parties to take and purchase said preferred stock in event of performance by the first party of the other provisions of this agreement.

In the event of performance by the first party then such fund so deposited is to be returned to the first party, together with interest at the rate of 4% per annum thereon. In event the first party shall fail to perform the conditions of this contract which are precedent to the obligation of the second parties, to actually take up and pay for such preferred stock, then such fund so deposited shall become the absolute property of the second parties, one-half to be paid to each, and therefrom the second parties shall pay any expenses incurred by them hereunder, including compensation of their counsel, and all other right or obligation of the parties hereto under this agreement shall be at an end.

13. This provision provides the price to be paid by second party for the preferred stock and the manner in which the same is to be paid and in substance provides that the purchase price shall be, $86.45833 per share, or a total of $518,749.98, the same to be paid as follows:

No part of the proceeds of such preferred stock shall be drawn upon until the entire sum of not less than $230,000.00 net proceeds of the common stock as hereinbefore provided for shall have been expended in the payment of architects' estimates given on account of the erection of such building.

After that sum had been expended as above provided each of the parties of the second part shall provide funds on account of the purchase of said stock at the rate of $25,000.00 per month ($50,-000.00 by both parties of the second part) for a

period of four months, to be paid out solely in the payment of architects' estimates.

After the four-months' period, the second party to provide such funds as may be needed to pay architects' estimates issued on account of the erection and completion of said building up to the total net purchase price of said stock. Provided, however, that a sum equal to $60,000.00 may be retained by second party until after the completion of such building.

The above is in substance of the contract between the parties as set out in the special findings of fact.

That at the time of executing said contract, all of appellants believed said Medical Arts Realty Company to have been legally incorporated and to be legally authorized to transact the business of making and performing said contracts, and the execution of said contract was authorized by them as directors, and the same was signed and delivered by appellants, Sterne and Beasley, respectively, as President and Secretary of the Medical Arts Realty Company, in good faith and as the act and contract of such organization; that said contract was executed in good faith and appellants then believed that the Medical Arts Realty Company would be able to construct said building and perform all of the things undertaken by it to be performed, and at the time of executing said contract, the Medical Arts Realty Company paid the appellees the sum of $25,000.00.

That immediately after the execution of said contract, the Medical Arts Realty Company sought to sell the common stock referred to in said contract, but found that it was impossible for it to do so, and it was unable to secure subscriptions for one-fourth of the stock it proposed to issue, to-wit: $275,000.00, and secured subscriptions of stock for only $14,600.00, and at no time was it able to pay into or cause to be paid into the treasury one-fourth of the subscription price of said stock, to-wit: $68,750.00, and it succeeded in paying into the

treasury only $13,000.00, and all this was known to it and to appellees not later than April 15, 1922, and at said time it made such facts known to appellee, the Peoples State Bank, and demanded that appellees should repay $25,000.00, after deducting from the same any reasonable compensation for time or labor or services they had rendered in the matter, and for any liability they had incurred to pay any person or persons in the matter of the preparation and execution of said contract; that at said time appellee, Peoples State Bank, refused to return to appellants or to the Medical Arts Realty Company any part of said $25,000.00.

Findings fourteen, fifteen, and sixteen of the special findings of fact relate to the method and manner by which the Medical Arts Realty Company secured from the Bedford Stone and Construction Company the $25,-000.00 which appellants deposited with appellees.

Special findings Nos. seventeen and eighteen relate to the use of the name of the appellee, Fletcher American Company, in connection with the campaign to sell the common stock of the Medical Arts Realty Company.

Special findings nineteen and twenty are in reference to what was said and done between the parties about appointing a receiver for the Medical Arts Realty Company, and numbers twenty-one, twenty-two and twenty-three deal with the request by representatives of appellees that certain notes given by certain subscribers to the capital stock of the Medical Arts Realty Company be paid by appellants before appellees would discuss the question of returning the $25,000.00.

That said Medical Arts Realty Company wholly defaulted in its contract, and on or about May 22, 1922, the Indiana Securities Commission, by formal action, rescinded any and all rights of such to sell any of its stock, either common or preferred. Said default was not due to any fault of appellees.

That at all times up to and after August 1, 1922, all of appellants believed said Medical Arts Realty Company to have been legally authorized to transact the business of making and performing said contract herein and the execution of said contract was authorized by appellants as directors and the same was signed by the officers of said company in good faith as an act and contract of said Medical Arts Realty Company.

That there was default on the part of said Medical Arts Realty Company in carrying into execution the terms and conditions of the contract and the said sum of $25,000.00, so belonging to the Medical Arts Realty Company and paid by it to appellee Peoples State Bank, under the terms of said contract, was forfeited on or about August 2, 1922, and taken by appellees for the non-performance of said contract on the part of the Medical Arts Realty Company.

That each appellee has incurred in matters in connection with said contract, a liability to pay attorneys in the sum of $1,500.00 for their services. If Medical Arts Realty Company had delivered said preferred stock to appellees, as provided in said contract on March 17, 1922, such stock would have had a market value of $100.00 per share, or $60,000.00 and by reason of the default of the Medical Arts Realty Company in the performance of said contract, appellees were damaged greatly in excess of $25,000.00.

This action was commenced and prosecuted by appellants as individuals and not by the Medical Arts Realty Company, on the theory, that having failed to sell one-fourth of the stock authorized by its charter and one-fourth of the subscription price paid into the treasury, no corporation was ever formed with rights and privileges to engage in business, and therefore appellants acted as partners and were bound as partners in the execution of the contract with appellees. Ap-

pellants rely upon the provision of the corporation act of 1921, Acts 1921, p. 98, §19, which provides:

"Every corporation shall, before beginning business, file with the county recorder a copy of its articles of incorporation approved by the Secretary of State. It shall have no rights or privileges as a corporation until it has complied with this requirement, and until one-fourth of its stock has been subscribed and one-fourth of the subscription price paid into the treasury of the corporation. . . ."

Appellees contend that the Medical Arts Realty Company, by filing its articles of incorporation with the Secretary of State setting forth the various things as required by section 4 of the above act; recording a duplicate thereof, approved by the Secretary of State, in the County Recorder's office, and the exercising of the rights of a corporation thereafter, constituted the Medical Arts Realty Company, a de facto corporation, and that, if there is any right of action against appellees, it is in the corporation and not in the individuals.

This is the first time this court has been called upon to give construction to the above section of the statutes. Similar statutes, however, have been before the courts of other states, and we find that they are not in complete harmony as to the effect of such a provision as we have under consideration.

In the case of *Wechselberg* v. *Flour City National Bank,* the United States Circuit Court of Appeals, Seventh Circuit (1894), 64 Fed. 90, had under consideration a statute of the State of Wisconsin, which provided:

"No such corporation shall transact business with any other than its members, until at least one-half of its capital shall have been duly subscribed, and at least twenty per centum thereof actually paid in; . . ."

In discussing the effect of the above provision the court quotes with approval from *Anvil Mining Co.* v. *Sherman* (1889), 74 Wis. 226, 42 N. W. 226, thus:

"This statute provides for the preliminary organization of the corporation, and then limits its power to enter upon its general business."

The court then said:

"The corporation has obtained the right to exist, but can only be said to have existence in a qualified sense, for it is not possessed of the attributes or privileges of perfected incorporation." . . . "It is however a bare, legal entity, which through organization may become a corporation, having members, and capable of transacting business."

Colorado had a similar statute, which fixed the fees to be collected by the secretary of state for incorporation and certain other privileges. The body of the act related entirely to the fees to be charged and collected for filing certificates of incorporation, etc., and then provided:

"No such corporation, joint-stock company or association shall have or exercise any corporate powers or be permitted to do any business in this state, until the said fee shall have been paid. . . ."

It was admitted in this case that the fees required by the statute had not been paid, but it was contended that the above provision was not a condition precedent to the formation of a de facto corporation. The court said in disposing of this contention:

"To recognize the defendant as a de facto corporation, would, as we have seen, be in direct conflict with the express language of the act, which declares that without the payment of the fee the corporation shall have no corporate power."

We quote further from this case:

"One object of this statute is to restrict the organization of 'wild-cat' corporations, it being supposed that the increased fee required by the act would, in a measure at least, prevent the over-capitalization of companies. The legislature being of the opinion that this purpose would be advanced by requiring the fee to be paid as a condition prece-

dent to the exercise of any corporate power, it is the duty of the courts to give effect to this intent as the same is manifest from the plain language of the act. The taking of title to the property in controversy being the exercise of a corporate power, and, as such forbidden until the fee for filing has been paid, it follows that the title of the Aspen Hardware Company as a corporation cannot be upheld. Having failed to comply with the statute, the Aspen Hardware Company, at the time of the transfer, was neither a de jure nor a de facto corporation, but simply a voluntary association of individuals in the nature of a co-partnership."

"There is a broad distinction between those acts made necessary by the statute as a prerequisite to the exercise of corporate powers and those acts required of individuals seeking incorporation, but are not made prerequisites to the exercise of such powers. In respect to the former, any material omission will be fatal to the existence of the corporation and may be taken advantage of collaterally in any form in which the fact of incorporation can properly be called into question. In respect to the latter, the incorporation is responsible only to the government in a direct proceeding to forfeit the charter."

The Maryland Court of Appeals, in the case of *Boyce* v. *Towsontown Station, etc.* (1877), 46 Md. 359, 374, in speaking on this subject said:

"The statute law of the State, expressly requiring certain prescribed acts to be done to constitute a corporation, to permit parties indirectly, or upon the principle of estoppel, virtually to create a corporation for any purpose, or to have acts so construed, would be in manifest opposition to the statute law, and clearly against its policy, and justified upon no sound principle in the administration of justice."

See also *Maryland Tube and Iron Works* v. *West End Improvement Co.* (1898), 87 Md. 207, 39 Atl. 620; *Joseph Medill* v. *James Collier et al.* (1866), 16 Ohio State 599; *American Ball Bearing Co.* v. *Adams* (1915), 222 Fed. 967.

The language of our statute, we think, is plain and unambiguous. By the express provisions of §19, *supra,* the Medical Arts Realty Company, by reason of ■ its failure to sell one-fourth of its authorized stock never became invested with any corporate life. It was expressly prohibited from engaging in business until this provision was complied with.

The purpose of this provision is obvious. It was manifestly the legislative intent to require the corporation to become financially responsible before the promoters would be relieved of responsibility, by contracting, and incurring liability on behalf of the incompleted corporation.

The failure of the Medical Arts Realty Company to sell its stock as required by our statute, was not, as we view it, a mere irregularity, which this court has many times held would not prevent the formation of at least a de facto corporation, but is a complete failure to perform a positive act enjoined upon them by the statute. It goes to one of the essential elements of a corporation, that of providing for the prudential affairs of the corporation. It was known by all parties connected with the execution of the contract that ■■ the Medical Arts Realty Company had not sold the required amount of stock to authorize it to engage in business. They were chargeable with knowledge of the provisions of our statute relating to the sale of stock. They executed the contract in question which was clearly a contract to engage in business, which all knew could not be performed until the requirements of the statute had been complied with. There is no room under the facts in this case for the application of the principal of *"estoppel in pais,"* as all had equal and full knowledge of the facts.

We conclude that the Medical Arts Realty Company,

by its failure to comply with the requirements of §19, Acts 1921, *supra*, never became a corporation, ██ with power or authority to execute the contract in question, and that appellants acted as individuals in the execution of said contract. Having executed the contract as individuals, and having assumed the liabilities of a partnership, they are entitled to all the rights and privileges as partners, and as such are entitled to maintain this action. *Jones* v. *Aspen Hardware Co.* (1895), 21 Colo. 263, 40 Pac. 457.

As to the question of damages, it is contended by appellees that the $25,000.00 deposited should be held to be liquidated damages and not a penalty. Again ██ we are faced with a question upon which the courts are in hopeless conflict. The situation is correctly stated by Judge Elliott, speaking for this court in the case of *Jaqua* v. *Headington et al.* (1887), 114 Ind. 309, 16 N. E. 527.

> "Few questions have more perplexed the courts than the one before us. The decisions are in hopeless conflict, and it is almost impossible to extract from them any satisfactory general rule. The decisions are little more than a multitude of particular instances—a mere collection, indeed, of special cases. We think, however, that out of the conflict and confusion one rule may be drawn, and that is this: Where the sum named is declared to be 'fixed as liquidated damages, is not greatly disproportionate to the loss that may result from a breach, and the damages are not measurable by any exact pecuniary standard, the sum designated will be deemed to be stipulated damages."

This rule thus announced has never been questioned in this state, and is well supported by authority. *Bird* v. *St. John's Episcopal Church of Elkhart* (1899), 154 Ind. 138, 56 N. E. 129; and cases there cited. But the cases are also generally agreed upon the principle that

the stipulated sum will not be allowed as liquidated damages unless it may fairly be allowed as compensation for the breach. Sedgwick on Damages, §407, p. 781, and cases there cited.

It was stated in *Jaquith* v. *Hudson* (1858), 5 Mich. 123, in considering the question of stipulated damages, as follows:

"But, while no one can fail to discover a very great amount of *apparent* conflict, still it will be found, on examination, that most of the cases, however conflicting in appearance, have yet been decided according to the justice and equity of the particular case. And while there are some isolated cases (and they are but few), which seem to rest upon no very intelligible principle, it will be found, we think, that the following general principles may be confidently said to result from, and to reconcile, the great majority of the cases, both in England and in this country:

"First. The law, following the dictates of equity and natural justice, in cases of this kind, adopts the *principle of just compensation* for the *loss* or *injury actually sustained;* considering it no greater violation of this principle to confine the injured party to the recovery of *less*, than to enable him, by the aid of the court to extort more. It is the application, in a court of law, of that principle long recognized in courts of equity, which, disregarding the penalty of the bond, gives *only* the *damages actually sustained.* This principle may be stated, in other words, to be, that courts of justice will not recognize or enforce a contract, or any stipulation of a contract, clearly unjust and unconscionable; a principle of common sense and common honesty so obviously in accordance with the dictates of justice and sound policy, as to make it rather matter of surprise that courts of law had not always, and in all cases, adopted it to the same extent as courts of equity. And, happily for the purposes of justice, the tendency of courts of law seems now to be towards the full recognition of the principle, in all cases.

"This principle of natural justice, the courts of law, following courts of equity, have, in this class of cases, adopted as the *law of the contract;* and

they will not permit the parties by express stipulation or any form of language, however clear the intent, to set it aside; on the familiar ground, *"conventus privatrum non potest publico juri derogare."*

"But the court will apply this principle, and disregard the express stipulation of parties, *only* in those cases where it is obvious from the contract before them, and the whole subject matter, that the principle of compensation has been disregarded, and that to carry out the express stipulation of the parties, would violate this principle, which alone the court recognizes as the law of the contract.

"The violation, or disregard of this principle of compensation, may appear to the court in various ways—from the contract, the sum mentioned, and the subject matter. Thus, where a large sum (say one thousand dollars) is made payable solely in consequence of the nonpayment of a much smaller sum (say one hundred dollars), at a certain day; or where the contract is for the performance of several stipulations of very different degrees of importance, and one large sum is made payable on the breach of any one of them, even the most trivial, the damages for which can, in no reasonable probability, amount to that sum; in the first case, the court must see that the real damage is readily computed, and that the principle of compensation has been overlooked, or purposely disregarded; in the second case, though there may be more difficulty in ascertaining the precise amount of damage, yet, as the contract exacts the same large sum from the breach of a trivial or comparatively unimportant stipulation, as for that of the *most* important, or of *all of them together*, it is equally clear that the parties have wholly departed from the idea of just compensation, and attempted to fix a rule of damages which the law will not recognize or enforce."

Paragraph 12 of the contract provides that the $25,-000.00 "shall be held as a guaranty for the performance by the first party to the conditions of this agreement which are precedent to the obligation of the second parties hereunder to take up and purchase said preferred stock, etc." The special finding of facts shows that as early as the latter part of May, 1922, appellees

were informed that the required amount of the capital stock could not be sold, and that appellants desired a receiver to be appointed at that time, but appellees objected to this procedure being taken. Also during the months of May and June, the parties hereto had conferences relating to the return of the $25,000.00. It will also be observed that by the third and fourth paragraphs of the 13th specification of the contract, which has to do with the manner of payment of the preferred stock by appellees, that the Medical Arts Realty Company was to first pay out the sum of $230,000.00 upon architects' estimates, before appellees were to pay any sum for said stock, and then provides that after this sum had been exhausted, appellees were to furnish $50,000.00 per month ($25,000.00 each) for a period of four months, and after this they were to furnish enough to pay the estimates as they were rendered till the full purchase price of the preferred stock had been paid, but the contract provided that appellees should have the right to retain $60,000.00 until the building was completed. At no time were the appellees required to arrange for the sum of $518,749.98, the total purchase price of the preferred stock. There was not, from the very provisions of the contract, any necessity for arrangements to be made by appellees for the purchase price of the preferred stock until long after appellees knew that the Medical Arts Realty Company would not be able to deliver the preferred stock, as provided for in the contract. They would have had several months, in any event, after they were called upon to perform, to arrange for payment as above noted. The special finding of facts does not set out any amount of damages suffered by appellees by reason of having made prearrangements for the payment of the preferred stock, and we can see no reason for any such conclusion.

Applying the rule of just compensation, as stated

above, also giving consideration to the provisions of the contract, that the failure of the Medical Arts Realty Company to perform any one of the many requirements, however trivial or unimportant, would have the same effect as the failure to perform the most important, or, even all of the provisions of the contract; also the language used by the parties, to the effect that the $25,000.00 was a "guaranty," we are of the opinion that said sum was intended by the parties to be used to compensate appellees for the actual damage they would suffer in case of a default on the part of the appellants, and not as agreed or stipulated damages.

Appellee claims that it makes no difference to them, as far as the final result is concerned, whether the $25,-000.00 be determined to be liquidated damages or a penalty, for, if it be considered liquidated damages, they are entitled to retain it, as it is conceded appellants failed to perform, and if it be considered a penalty, the evidence shows that they were damaged more than that amount. Appellees contend, and the special finding of facts state, that, had the Medical Arts Realty Company delivered the stock as per agreement, said stock would have had a market value of $100.00 per share, and that appellees would have been able to sell said stock at a profit of $60,000.00. The stock to be sold and delivered to appellees was the preferred stock in the Medical Arts Realty Company, a corporation which was never fully organized; a corporation that never breathed the breath of life; a corporation that never became bound by the contract executed by appellants in its name, and which it could have refused to perform had it come into existence with power to transact business as a corporation. Appellees seek to retain the money in controversy as damages, because it was not permitted to purchase stock in a corporation that was never formed, on a contract between themselves and

third parties (appellants). Nowhere in the contract did appellants personally guarantee that the Medical Arts Realty Company would sell and deliver to appellees $600,000.00 par value preferred stock in said company, or agree to be responsible in damages upon a refusal of said corporation to be bound by the contract if it became a corporation with power to act. Appellees knew that appellants had no stock to sell, and knew that the contract signed in the name of the Medical Arts Realty Company by appellants did not and could not be binding on the proposed corporation, when organized, unless the corporation itself so elected.

The profit which appellees might have made by the sale of the preferred stock in the Medical Arts Realty Company, had the same been delivered to them under the contract, at most, would, of necessity, be extremely doubtful and speculative and too remote, even if we could say that such damage would be proper at all as against these appellants as individuals, or proper under the pleadings in this case, where appellees filed only a general denial. We therefore conclude that the court was in error in considering this element of damage.

We therefore hold that the appellants, as individuals, would not, under the facts in this case, be responsible to appellees for any profits they might have made by the sale of the preferred stock of the corporation that was never completely organized.

It is conceded by appellants, by their complaint and also in their brief, that appellees have incurred a liability of $3,000.00 in connection with the execution of the contract herein and that said amount is a proper element of damages for which they are liable. We think it clear that any liability incurred by appellees in connection with the execution of the contract in question is a proper element of damages, for which appellants would be liable, and appellees should be al-

lowed to retain the sum of $3,000.00 as against these appellants.

The lower court erred in its conclusion of law and therefore the judgment of the lower court should be reversed.

Judgment reversed with instructions to the lower court to restate its conclusion of law in accordance with this opinion, and render judgment accordingly.

The death of Albert E. Sterne having been suggested, this judgment is reversed as of date of submission.