**TIME WARNER ENTERTAINMENT COMPANY, L.P., Appellant (Defendant below),**

v.

**Kelly J. WHITEMAN and Jean Wilson, Appellees (Plaintiffs below).**

No. 49S02–0402–CV–47.

Supreme Court of Indiana.

Feb. 3, 2004.

Rehearing Denied March 22, 2004.

Scott D. Himsel, Brent D. Taylor, Jennifer K. Bowman, David K. Herzog, Baker &

Daniels, Indianapolis, IN, Attorneys for Appellant.

Karl L. Mulvaney, Nana Quay–Smith, Candace L. Sage, Bingham McHale, LLP, Irwin B. Levin, Richard E. Shevitz, Scott D. Gilchrist, Cohen & Malad, P.C., Indianapolis, IN, Attorneys for Appellees.

SULLIVAN, Justice.

Two customers of a cable television company who paid the "late fees" imposed on their bills sued to get back a portion of the money they had paid, arguing that the fee imposed exceeded the cable company's cost of collection. The Court of Appeals held that they were not entitled to recover because they had made the payments voluntarily. We hold that the "voluntary payments doctrine" is not applicable here.

### Background

Jean Wilson and Kelly Whiteman were both subscribers to the cable television service of Time Warner Entertainment, L.P. Each signed a contract with Time Warner that required her to pay for her cable service by the due date listed on her monthly bill, and permitted Time Warner to charge a late fee if she failed to do so. We will refer to Wilson and Whiteman collectively in this opinion as the "Customers" although the contracts each of them signed with Time Warner were materially different from one another.

Wilson signed her contract on August 29, 1992. It read in pertinent part:

TERMS AND CONDITIONS FOR
SERVICE AND EQUIPMENT
RENTAL AGREEMENT

1. Monthly service charges will be billed in advance and are payable by

Date Due printed on statement. If payment is not received by Date Due, a handling charge called "Late Fee" will be applied to delinquent accounts.

(R. 360.)

Whiteman signed her contract on January 6, 1996. It read in pertinent part:

## TERMS AND CONDITIONS FOR SERVICE AND EQUIPMENT RENTAL AGREEMENT

1. Customer agrees to pay for cable television services provided to customer including charges for installation, equipment, tier service (including basic tier), services provided on a per channel or per program basis, or any other service provided by American Cablevision of Indianapolis [1] (the "Company") and all applicable local, state or federal fees and taxes. Monthly service charges will be billed in advance (except for per program charge) and are payable by date due printed on statement for that billing period. If payment is not received by Due Date an administrative charge called "Late Charge" of $4.40 will be applied to customer's account.

(R. 363.)

The material difference between these two contracts is, of course, that Wilson's contract did not set forth an explicit amount for the "Late Charge"; Whiteman's did.[2] Despite this difference, neither side in this litigation contends that the difference matters.[3]

Time Warner did in fact impose upon both Customers a "late fee" of $4.40 (before January, 1998) and $4.65 (after January, 1998) when payment had not been received by the "Date Due." In fact, Time Warner says that such a fee was imposed on more than 20,000 of its 84,000 Indianapolis subscribers each month.

The Customers originally filed separate lawsuits against Time Warner. In broad

---

1. American Cablevision of Indianapolis is apparently a predecessor in interest to Time Warner.

2. The bills actually received by both Wilson and Whiteman did prominently set forth the specific amount of the "Late Charge" that would be imposed if their payments were not received by the due date.

3. We repeat our observation made in the text that while Wilson's contract did not set forth an explicit amount for the "Late Charge" and Whiteman's did, neither side in this litigation contends that the difference matters.

Were Wilson litigating this case alone, we might have expected her to argue that summary judgment was inappropriate because, in the absence of a specific dollar amount, the contract was ambiguous as to whether she was to pay actual damages or liquidated damages in the event of a late payment. *See Fresh Cut v. Fazli,* 650 N.E.2d 1126, 1133 (Ind. 1995) (where contract was ambiguous, summary judgment was inappropriate). But because Whiteman's contract contained a specific dollar amount, the Customers together could not make this argument with respect to Customers in Whiteman's situation.

On the other hand, were Whiteman litigating this case alone, we might have expected Time Warner to argue for summary judgment on the straightforward proposition that Whiteman agreed to pay a specific amount in the event her payment was late and the freely bargained agreement of the parties should not be set aside. *Trimble v. Ameritech Publ'g,* 700 N.E.2d 1128, 1129 (Ind.1998) ("Courts in Indiana have long recognized the freedom of parties to enter into contracts and have presumed that contracts represent the freely bargained agreement of the parties."). But because of the ambiguity of Wilson's contract, Time Warner could not make this argument with respect to Customers in Wilson's situation.

None of these arguments have been advanced. Instead, as will be discussed *infra,* the parties debate whether the "voluntary payment doctrine" was applicable and whether the late fees constituted liquidated damages or penalties. We limit our review to the contentions raised by the parties.

terms, they sought to recover the late fees paid to Time Warner in excess of Time Warner's actual damages caused by late payment. Customers also sought declaratory and injunctive relief to prevent Time Warner from charging excessive late fees in the future.

For its part, Time Warner maintained that the late fee covered only a portion of the costs it incurred as a result of subscribers' late payments. These costs include those of its "in-house collection department" (consisting of customer service representatives who speak with delinquent subscribers and lobby personnel who accept payments from late subscribers who are late); field collectors who visit subscribers at their homes; and contract collection agencies that pursue unpaid balances.

On Time Warner's motion, the two lawsuits were consolidated for purpose of discovery and pretrial proceedings. Time Warner subsequently filed a Motion to Dismiss and for Summary Judgment on the basis that Indiana's "voluntary payment doctrine" prohibits recovery of funds voluntarily paid under the payor's mistaken belief as to the legal obligation of the payment. Time Warner also contended that none of the customers' claims for money damages states a cognizable claim under Indiana law because the late payment provisions of the contracts constituted valid and enforceable liquidated damage clauses.

The trial court initially granted Time Warner's Motion to Dismiss and Motion for Summary Judgment, concluding that the Customers' claims for money damages were barred by the voluntary payment doctrine and that Time Warner's late fee was a valid liquidated damage assessment. But following a hearing on the Customers'

motion to correct error, the trial court vacated its earlier ruling and permitted the action to proceed on the merits.

The Court of Appeals affirmed in part and reversed in part. *Time Warner Entertainment Co. v. Whiteman*, 741 N.E.2d 1265, 1275 (Ind.Ct.App.2001). It concluded that genuine issues of material fact existed with respect to the cost basis for Time Warner's late payment charges, and affirmed the trial court's decision to reinstate the Customers' claims for injunctive and declaratory relief.[4] However, the Court also determined that the Customers' claims for money damages were barred by the voluntary payment doctrine as a matter of law, and concluded that the trial court abused its discretion by granting the Customers' motion to correct error as to this claim.

### Discussion

### I

Time Warner argues, and the Court of Appeals held, that the Customers are not entitled to the repayment of any of the late fees paid because they paid those amounts voluntarily. This argument invokes Indiana's "voluntary payment doctrine" which has analogs in many other states.

 Hornbook law sets forth three propositions in this regard:

As a general rule, money voluntarily paid with a full knowledge of all the facts, and without any fraud or imposition on the payor, cannot be recovered back, although it was not legally due.

Generally a voluntary payment made under a mistake or in ignorance of law, but with a full knowledge of all the facts, and not induced by any fraud or improper conduct on the part of the payee, cannot be recovered back.

---

4. We summarily affirm the Court of Appeals as to this issue. Ind.App. R. 58(A)(2).

In general money paid under a mistake of fact, and which the payor was under no legal obligation to make, may be recovered back, notwithstanding a failure to employ the means of knowledge which would disclose a mistake.

23 I.L.E., *Payment* §§ 41, 42–43 (1970). See also C.J.S. §§ 113–114 (1987). Our court resolved a number of 19th century disputes using these principles. Three are representative.

In *Bond v. Coats*, 16 Ind. 202 (Ind.1861), Coats sued Bond. Coats had rented a mule from Bond to work on a ferry-boat. While Coats had the mule, it died through no fault of Coats. Coats nevertheless paid Bond for the mule, thinking he was legally obligated to do so. When Coats discovered that he was not legally obligated to pay for the mule, he sued to get his money back. We held Coats unable to recover the amount paid. "He had full knowledge of [the facts]; but alleges he was mistaken as to his rights, in a matter in which he had constituted himself a judge in his own cause, and decided against himself. We are of opinion that the weight of authority is that he can not be now heard to reverse his own judgment." *Id.* at 203.

In *Downs v. Donnelly*, 5 Ind. 496 (1854), Donnelly sued Downs. Donnelly had paid Downs the amount of a debt owed to Downs by the estate of a man named Ross. Ross was Donnelly's wife's deceased former husband and Downs had threatened to sue Donnelly for the amount of the debt. Thinking he was legally obligated to pay the debt and not wanting to be sued, Donnelly paid Downs. When Donnelly discovered that he was not legally obligated to pay the estate's debt, he sued to get his money back. We held Donnelly unable to recover the amount paid. "His right of recovery is exclusively based upon an alleged mistake. If that was a mistake of law, it is fully settled that proof of such

misapprehension will not enable the party to recover back money voluntarily paid under a claim of right. The construction of law is open to both parties and each is presumed to know it." *Id.* at 505.

In *Lafayette & I.R. Co. v. Pattison*, 41 Ind. 312 (Ind.1872), Pattison sued a railway. Pattison had paid shippers freight charges on cattle shipped from Chicago to Indianapolis. He then sued the shippers to recover alleged overcharges. We held that Pattison was entitled to pursue recovery because his payments were not voluntary. "[W]here one person was in possession of the goods or property of another, and refused to deliver the same up to that other, unless the latter paid him a sum of money which he had no right to receive, and the latter, in order to obtain possession of his property, paid that sum, the money so paid was a payment by compulsion, and may have been recovered back." *Id.* at 327, 328. *See also Chicago, St. L. & P.R. Co. v. Wolcott*, 141 Ind. 267, 39 N.E. 451 (1895) (also holding alleged railway overcharges could be recovered).

To these interesting older cases, we add the one discussed by the Court of Appeals, *City of Evansville v. Walker*, 162 Ind.App. 121, 318 N.E.2d 388, 389 (1974). The plaintiffs had paid fines to the city for parking violations committed on federal property. When the plaintiffs discovered that the city had no legal authority to impose fines for parking violations on federal property, they sued to get their money back. The court held the plaintiffs unable to recover, having chosen not to contest the legality of the fines and voluntarily pay them instead. *Id.* at 123, 318 N.E.2d at 390.

It is clear that cable customers throughout the country (and, dare we say, their lawyers) have been aggressive in bringing claims similar to those asserted in this case against cable television operators.

For their part, the cable operators (and their lawyers) have been successful in deploying the voluntary payment doctrine to block these claims. Indeed, it appears that the "weight of authority from other jurisdictions" strongly influenced the Court of Appeals to apply the voluntary payment doctrine in behalf of Time Warner here. *Time Warner*, 741 N.E.2d at 1271–1272 (citing cases). We note that since the decision of the Court of Appeals, our colleagues in Wisconsin have also decided this issue in favor of the cable operators. *Putnam v. Time Warner Cable of Southeastern Wis., L.P.*, 255 Wis.2d 447, 649 N.W.2d 626 (Wis.2002).

■ While we acknowledge the "weight of authority" favoring Time Warner's position, we decline to follow it.

First, looking to our own precedents, we think the Customers make a good argument that they are far more like the plaintiffs in *Pattison* and *Wolcott* than the plaintiffs in the other cases described. The *Pattison* and *Wolcott* plaintiffs were put in the position by the respective railroad defendants of having to pay in order to receive their property; the customers allege they were put in the position by Time Warner of having to pay in order to continue to receive cable service. The plaintiffs against whom the voluntary payment doctrine was enforced faced no immediate deprivation of goods or services if they did not pay.

■ Second, we are sympathetic to contemporary scholarly opinion that suggests the distinction between a mistake of law and a mistake of fact is artificial. While the American Law Institute's 1937 Restatement of Restitution is frequently cited for the distinction,[5] the current tentative draft of a new Restatement of Restitution & Unjust Enrichment (Third) eliminates it.[6] The tentative draft—correctly, we think, limits application of the voluntary payment doctrine to situations where a party has voluntarily paid a disputed amount:

> Voluntary payment. The restitution claim to recover a payment in excess of an underlying liability—a claim that is frequently described in terms of mistaken payment—meets an important limitation in the so-called voluntary-payment rule. The rule appears in frequent judicial statements to the effect that "money voluntarily paid with knowledge of the facts cannot be recovered back." Statements of this kind must be treated with caution. In a business setting, it is at least paradoxical to suppose that the overpayment of an asserted (or any payment of a non-existent) liability could ever be "voluntary," and it is important to bear in mind that the proper operation of the voluntary-payment rule must be realistic rather than artificial. The rule does not, for example, impute knowledge of relevant circumstances of which the payor is not in fact aware, describing as "voluntary" a payment

5. *Restatement of Restitution* § 45 (1937) provides in relevant part that "a person who, induced thereto solely by a mistake of law, has conferred a benefit upon another to satisfy in whole or in part an honest claim of the other to the performance given, is not entitled to restitution."

6. *Restatement (Third) of Restitution & Unjust Enrichment* § 6(2) (Tentative Draft No. 1, 2001) provides that "[p]ayment of money re-

sulting from a mistake by the payor as to the existence or extent of the payor's obligation to an intended recipient gives the payor a claim in restitution against the recipient to the extent the payment was not due." Comment c points out that "[r]elief is available ... without regard to whether the mistake might be characterized as ... a mistake of fact or a mistake of law."

that was actually the consequence of negligence or inadvertence. When properly employed, a reference to "voluntary payment" is judicial shorthand for a truth of common experience: that a person must often choose to act on the basis of imperfect knowledge, accepting the risk that further information (acquired with the benefit of hindsight) may reveal the choice to have been less than optimal. A more appropriate statement of the voluntary-payment rule, therefore, is that money voluntarily paid *in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient* may not be recovered, on the ground of "mistake," merely because the payment is subsequently revealed to have exceeded the true amount of the underlying obligation.

*Restatement (Third) of Restitution & Unjust Enrichment* § 6 cmt. e (Tentative Draft No. 1, 2001) (emphasis in original). We think it clear that at minimum there is a genuine issue of material fact as to whether Customers voluntarily paid the late fees in the face of a recognized uncertainty as to the existence or extent of an obligation to Time Warner.

Third, while the weight of authority does favor Time Warner, it is not unanimous. *TCI Cablevision of Dallas v. Owens*, 8 S.W.3d 837 (Tex.Ct.App.2000), discussed by the Court of Appeals, goes the other way. So does the dissent of Justice Bablitch, joined by Chief Justice Abrahamson, of the Wisconsin Supreme Court in *Putnam*. Justice Bablitch makes several interesting points. He argues that, "as a general proposition, customers in a government created monopoly [*i.e.*, cable] deserve special protection" because they have nowhere else "to go for cable services." *Putnam*, 649 N.W.2d at 642. He accurately observes that, "for purposes of this case at this time in the proceedings,

we must assume the truthfulness of all the [customer's] allegations." *Id.* at 643. The same is true in our case. And he rightly asks, "Why should a customer protest the payment of a fee if it has no reason at the time of payment to believe that it is unreasonable and/or unconscionable? If that is the law, and the majority says it is, then all payees of all late fees pursuant to prior agreements regarding late fee payments, whether to banks, credit cards, bills for services, and the like, must automatically protest at the time of payment or lose the right to contest it. That is, of course, absurd." *Id.*

Fourth, the principal policy justifications for applying the voluntary payment doctrine do not seem to us to line up very well in this situation. These justifications were aptly set forth by Justice Prosser for the majority in the Wisconsin case:

> There are two primary reasons why courts have adopted the voluntary payment doctrine. First, the doctrine allows entities that receive payment for services to rely upon these funds and to use them unfettered in future activities. Second, the doctrine operates as a means to settle disputes without litigation by requiring the party contesting the payment to notify the payee of its concerns. After such notification, a payee who has acted wrongfully can react to rectify the situation.

*Id.* at 633 (citations omitted).

As to the first of these justifications, we do not believe that it is appropriate as a matter of policy for us to favor a private enterprise over private individuals in this respect. We believe the principle cited here was derived from cases like *City of Evansville* where the payee is a unit of government and presumably makes the "unfettered" use of the funds on behalf of all of the citizens of its jurisdiction. The

same rationale does not apply to a private business. Judge Schudson of the Wisconsin Court of Appeals made this point with some force:

> [I]t is undisputed that if the late fee (or a portion thereof) is unlawful, Time Warner never should have charged it. Why, then, should Time Warner be allowed to take financial advantage of its own wrongdoing? If the [reliance on funds received] rationale applies, the answer is clear, and Time Warner is in the clear. If, however, the [reliance on funds received] rationale (explaining why government is insulated against such a claim) does not apply to a private enterprise that, in our free-market economy, perhaps should be expected to suffer the consequences of its wrongdoing, then the customers' claim survives, notwithstanding the voluntary payment doctrine.

*See Putnam v. Time Warner Cable of Southeastern Wis., L.P.,* 247 Wis.2d 41, 633 N.W.2d 254, 270 (Wis.Ct.App.2001) (Schudson, J., concurring and dissenting), *aff'd,* 255 Wis.2d 447, 649 N.W.2d 626.

As to the second rationale—that the doctrine operates as a dispute resolution mechanism—we believe the comment set forth *supra* from the tentative draft of the new Restatement of Restitution properly limits the scope of this rationale to situations where money has been "voluntarily paid in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient." *Restatement (Third) of Restitution & Unjust Enrichment* § 6 cmt. e (Tentative Draft No. 1, 2001).

We hold that the voluntary payment doctrine does not bar Customers' claims.

## II

Time Warner asserts a second reason why the Customers' complaints should be dismissed: that the late fee provisions of both contracts constituted valid "liquidated damage" clauses pursuant to which Time Warner and the Customers agreed on what would happen if the Customers did not pay their bills on time.

 The term "liquidated damages" applies to a specific sum of money that has been expressly stipulated by the parties to a contract as the amount of damages to be recovered by one party for a breach of the agreement by the other, whether it exceeds or falls short of actual damages. *Merrillville Conservancy Dist. v. Atlas Excavating,* 764 N.E.2d 718, 724 (Ind.Ct. App.2002) (*citing George B. Swift Co. v. Dolle,* 39 Ind.App. 653, 80 N.E. 678, 681 (1907)); Black's Law Dictionary 395 (7th ed.1999). "A typical liquidated damages provision provides for the forfeiture of a stated sum of money upon breach without proof of damages." *Gershin v. Demming,* 685 N.E.2d 1125, 1127 (Ind.Ct.App.1997).

The history of litigation of liquidated damage clauses suggests that their enforceability turned on whether the nature of the parties' agreement was such that in the event of a breach, the damages resulting from the breach would have been difficult to ascertain. If actual damages could be readily calculated and the amount stipulated exceeded actual damages, then the contract provision was treated as a "penalty" and only actual damages awarded.

 Here is a sort of classic statement of the issue:

> Where the sum named is declared to be fixed as liquidated damages, is not greatly disproportionate to the loss that may result from a breach, and the damages are not measurable by any exact pecuniary standard, the sum designated will be deemed to be stipulated damages.

*Jaqua v. Headington,* 114 Ind. 309, 310, 16 N.E. 527, 528 (1888). Nearly a half century later, we relied on *Jaqua* to hold a stipulated sum to be a penalty and not enforceable. *Sterne v. Fletcher American Co.,* 204 Ind. 35, 181 N.E. 37 (Ind.1932). Indeed, in that case we said that a "stipulated sum will not be allowed as liquidated damages unless it may fairly be allowed as compensation for the breach." *Id.* at 49–50, 181 N.E. at 43.

This policy of skepticism toward the enforceability of liquidated damage clauses was grounded in equitable notions of equity and natural law:

"It is the application, in a court of law, of that principle long recognized in courts of equity, which, disregarding the penalty of the bond, gives only the damages actually sustained."

*Id.,* 204 Ind. at 50, 181 N.E. at 43, (*quoting Jaquith v. Hudson,* 5 Mich. 123, 133 (1858)).

Even as we turn from the 20th to the 21st century, when codification of commercial law have greatly reduced the role of equity in resolving business disputes, our case law maintains this skepticism. Recently, the Court of Appeals held a stipulated damages provision in a contract to be an unenforceable penalty. Its explication of the relevant law reflects much of current jurisprudence:

"In determining whether a stipulated sum payable on a breach of contract constitutes liquidated damages or a penalty, the facts, the intention of the parties and the reasonableness of the stipulation under the circumstances of the case are all to be considered." [*Gershin v. Demming,* 685 N.E.2d 1125, 1127 (Ind.Ct.App.1997).] If the sum sought by a liquidated damages clause is grossly disproportionate to the loss that may result from a breach of contract, we should treat the sum as a penalty rather

than liquidated damages. *Rogers v. Lockard,* 767 N.E.2d 982, 991 (Ind.Ct. App.2002). "Liquidated damages provisions are generally enforceable where the nature of the agreement is such that when a breach occurs the resulting damages would be uncertain and difficult to ascertain." *Gershin,* 685 N.E.2d at 1127. However, to be enforceable the stipulated sum must fairly be allowed as compensation for the breach. *Id.* at 1127–28. Additionally, we construe any contract ambiguity against the party who drafted it. *Rogers,* 767 N.E.2d at 990. If there is uncertainty as to the meaning of a liquidated damages clause, classification as a penalty is favored. *Id.* at 992.

*Olcott Int'l & Co. v. Micro Data Base Sys.,* 793 N.E.2d 1063, 1077 (Ind.Ct.App.2003), *transfer denied,* 2003 WL 21961463, 2003 Ind. LEXIS 1094.

Unlike our colleagues on the Court of Appeals, we have not had much opportunity to wrestle with these issues in recent years. But some of our most important cases have been consistent with the principles enunciated in *Olcott.* Compare *Raymundo v. Hammond Clinic Assn.,* 449 N.E.2d 276, 284 (Ind.1983) (holding valid as liquidated damages payment of $25,000 for violation of a restrictive covenant not to compete, largely because of the uncertainty in determining the amount of actual damages) *with Skendzel v. Marshall,* 261 Ind. 226, 233 234, 301 N.E.2d 641, 645–646 (Ind.1973) (holding invalid as a penalty a land contract vendees' forfeiture of $ 21,-000, "well over one-half the original contract price").

Despite the longstanding principles represented by these cases of ours and the Court of Appeals, we are left with some unease over any decision where what appears to be the freely bargained agreements of the parties are set aside. Fixing

the respective rights and expectations of the parties as to damages makes economic and commercial sense. Enforcing such provisions would seem to conform to this Court's longstanding recognition of the freedom of parties to enter into contracts and our presumption that contracts represent the freely bargained agreement of the parties. *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1129 (Ind.1995). However, both sides in this lawsuit seem quite content to litigate this issue based on these principles as set forth and so we will decide it on this basis.

### III

■ As noted under *Background, supra,* Wilson signed a contract with Time Warner in which she agreed to pay "a handling charge called 'Late Fee' " if her monthly payments were not received by the due date. The amount of the "late fee" was not specified in the Wilson contract. Whiteman, on the other hand, agreed to pay a " 'Late Charge' of $4.40" if her monthly payments were not received by the due date.

As noted under part II, *supra,* Time Warner asserted that the late fee provisions of both contracts constituted valid and enforceable "liquidated damage" clauses because the "undisputed facts" established that amount of the late fees were "less than the estimated average cost that Time Warner incurs because of late payment." [7] (Br. of Appellant at 24.) Time Warner said it was entitled to summary judgment because these "undisputed facts"

showed that its late fees met the relevant legal standard of not being "grossly proportionate" to its losses due to late payments. (*Id.* at 26.)

■ Summary judgment is appropriate where the evidence shows there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. *Butler v. City of Peru*, 733 N.E.2d 912, 915 (Ind.2000); *see* Ind. Trial Rule 56(C); *Shell Oil Co. v. Lovold Co.*, 705 N.E.2d 981, 983–84 (Ind.1998). But the burden here is on Time Warner as the party seeking summary judgment to negate the existence of any genuine issue of material fact. *Winkler v. V.G. Reed & Sons,* 638 N.E.2d 1228, 1235 (Ind.1994). And all facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. *Butler,* 733 N.E.2d at 915.

The Customers responded that the late fees they were charged were indeed grossly disproportionate to the damages actually suffered by Time Warner when the Customers did not pay their bills on time. They offered as evidence affidavits of two experts that dispute the methodology used by Time Warner in the cost study.

Andrea C. Crane, described as a regulatory rate-setting consultant and former Ratepayer Advocate for the State of New Jersey, reviewed Time Warner's cost study and testified that the methodology employed was flawed because it "included many costs in excess of those incremental costs directly related to collection of late

---

**7.** A study by Time Warner of "the costs it incurred from January through October 1997 due to the fact that some of its subscribers did not pay their bills when due" (Br. of Appellant at 7) concluded that amount of the late fees were "less than the estimated average cost that Time Warner incurs because of late payment" (*Id.* at 24). Time Warner characterizes these conclusions as "undisputed

facts." As discussed under Background, *supra,* the costs include those of its "in-house collection department" (consisting of customer service representatives who speak with delinquent subscribers and lobby personnel who accept payments from late subscribers who are late); field collectors who visit subscribers at their homes; and contract collection agencies that pursue unpaid balances.

payments." For example, she found that (1) costs included in the study for non-collection were not properly attributable to customers who simply pay late, (2) costs for salary and wage categories included in the study are not incrementally related to late payments and Time Warner would not experienced lower costs for these positions all customers made timely payments, and (3) costs included in the study such as general insurance, utilities, property taxes, and appreciation should not be included in a late fee since the level of such costs does not change as a result of late payments.

John F. Lehman, described as a certified public accountant and former partner with the accounting firm of Deloitte & Touche who has testified against at least 15 cable television providers in "late fee" litigation, also reviewed Time Warner's cost study and also identified what he described as a number of fundamental flaws in the basic methodology. His findings were quite similar to Ms. Crane's. In addition, he estimated that the maximum damage caused to Time Warner by a customer who pays late is no more than 36 cents.

We think the Crane and Lehman affidavits are sufficient to create a genuine issue of material fact as to whether the late fee provisions were valid and enforceable liquidated damage clauses. We hold that Time Warner's motion for summary judgment was properly denied.

### Conclusion

We grant transfer pursuant to Ind.App. R. 58(A) and affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.