**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**JAMES E. AYERS**
Wernle, Ristine & Ayers
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE:

**BRYCE H. BENNETT, JR.**
**BRANDON J. ALMAS**
Riley Bennett & Egloff, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

.

| | | |
|---|---|---|
| SMITA RADHAKRISHNAN, | ) | |
| | ) | |
| Appellant-Defendant/Counter-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1303-PL-202 |
| | ) | |
| ACCESS THERAPIES, INC., | ) | |
| | ) | |
| Appellee-Plaintiff/Counter-Defendant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable S.K. Reid, Judge
Cause No. 49D14-0711-PL-50819

**January 21, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Access Therapies, Inc. ("Access") filed a complaint against its employee Smita Radhakrishnan ("Radhakrishnan"), a foreign national, alleging that she had breached her employment contract. Radhakrishnan filed a counterclaim for costs and attorney fees, contending that Access's claim was frivolous, unreasonable, or groundless. Following a bench trial, Radhakrishnan appeals the trial court's order finding that she breached the contract and ordering her to pay damages in the amount of $32,237.60 plus costs and interest. Radhakrishnan also appeals the trial court's dismissal of her counterclaim. Accordingly, Radhakrishnan raises the following consolidated and restated issues for our review:

I.      Whether the trial court erred in finding that Radhakrishnan had breached the contract; and

II.      Whether the trial court erred in dismissing Radhakrishnan's counterclaim.

We affirm in part, reverse in part, and remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Access provides physical therapists and occupational therapists as temporary employees in hospitals and nursing homes throughout the United States. As part of its business, Access provides job placement opportunities to foreign nationals.

Radhakrishnan, a trained physical therapist from India, moved to Canada in 1999 and became a Canadian citizen in 2003. In 2003, Radhakrishnan also came to the United States as a foreign national on an H-4 dependent visa, which she obtained through her husband who was working in California on an H-1B Visa (a Federal work visa for

2

individuals working in a specialty occupation).  To work as a therapist in the United States, Radhakrishnan needed a physical therapy license for the state in which she was to work and either a valid Federal work visa or an Employment Authorization Document ("EAD").  In 2005, Radhakrishnan obtained a license to work as a physical therapist in Michigan.

On April 23, 2006, Radhakrishnan contacted Access by email, expressing her interest in obtaining employment as a physical therapist for Access.  On May 5, 2006, Radhakrishnan entered into a contract with Access ("the Contract").  Under the Contract, Access stated its desire to sponsor Radhakrishnan to work in the United States for a "period of not less than 18 months after Employee receives [her] work permit."  *Appellant's App*. at 14.  To begin the process of obtaining Radhakrishnan's EAD and green card (permanent resident status), Access's attorney, Felix Vinluan ("Vinluan"), filed the following documents with the United States Citizenship and Immigration Services ("USCIS") on June 22, 2006:  (1) Immigration Petition for Alien Worker on Form I-140; (2) Application to Adjust to Permanent Resident Status on Form I-485; and (3) Application for Employment Authorization on Form I-765.[1]  *Joint Stipulated Ex.* 4 at 1-3.[2]  A USCIS Notice of Action, dated August 2, 2006, informed Vinluan and Radhakrishnan that the

---

[1] A Green Card holder is a permanent resident of the United States who has permission to live and work in the United States.  http://www.uscis.gov/greencard (last visited Dec. 17, 2013).  The steps to become a permanent resident vary by category and depend on whether you live inside or outside the United States.  *Id*.  Most individuals are sponsored by a family member or employer in the United States.  *Id*.  Other individuals may become permanent residents through refugee status or other humanitarian programs.  *Id*.  Access filed documents on Radhakrishnan's behalf so that she could work for Access, and hopefully become a permanent resident.

[2] The Joint Stipulated Exhibits contain no internal numbering.  For ease of reference, however, we have included pinpoint citations that refer only to the page numbers as manually counted.

application for employment authorization (Form I-765) had been approved and that Radhakrishnan would receive her EAD in a separate correspondence. *Id.* The notice stated that Radhakrishnan was authorized to work in the United States "during the dates on the card," *i.e.*, from July 28, 2006 to July 27, 2007. *Id.* Vinluan's office informed Radhakrishnan that, since the EAD was valid for only twelve months of the eighteen-month Contract, Radhakrishnan should contact Vinluan ninety days before the EAD expired in order to renew it. *Tr.* at 97.

Radhakrishnan's first assignment for Access commenced on August 29, 2006; accordingly, the term of the Contract ended on February 29, 2008. In this assignment, Radhakrishnan worked with Transitional Health Services in Fremont, Michigan; she successfully completed her six-week obligation on October 6, 2006. *Id.* at 81.

Radhakrishnan's second assignment was with Eaton County Medical Care Facility ("Eaton Care") in Charlotte, Michigan. Pursuant to a contract ("Employer Contract") between Access and Medical Connections, Inc.—the company that oversaw the staffing needs for Eaton Care—Access agreed that Radhakrishnan would work as a physical therapist for a period of thirteen weeks, from January 23, 2007 through April 20, 2007. *Tr.* at 81; *Joint Stipulated Ex.* 6 at 4. Radhakrishnan successfully completed this assignment and, at the end of the thirteen-week assignment, Access consented to Radhakrishnan's request that the assignment with Eaton Care be renewed for an additional thirteen weeks— her third assignment. *Tr.* at 81.

4

The details of the third assignment were set forth in Exhibit A-1 of the Employer Contract, which provided that Radhakrishnan would work for thirteen weeks during a sixteen-week period that ran from April 23, 2007 through August 10, 2007.[3] As part of the Employer Contract, three weeks in May were designated as pre-approved, unpaid leave that Radhakrishnan was granted to attend a family wedding in India. *Joint Stipulated Ex.* 6 at 5.

More than ninety days prior to the July 27, 2007 expiration of her EAD, Radhakrishnan contacted Vinluan's office to ensure that the renewal process of her EAD was timely commenced. Around July 18, 2007, when Radhakrishnan had still not received the renewed EAD, she contacted Vinluan to clarify her working status. Vinluan confirmed that "working without a valid EAD" was "an illegal status." *Tr.* at 83. On July 23, 2007, Radhakrishnan sent an email to the Chief Operating Officer for Access, Harvinder Dhani ("Dhani"), which stated:

> This is to reiterate that my current EAD expires on July 27, 2007 and I will not be able to continue working on the current contract after July 27 in an invalid EAD status. The lawyer at Vinluan's office had clearly stated that working without a valid EAD is illegal and is a chance that some people are taking. With 2 RFEs[4] already issued on my I140/485 case so far, I am not

---

[3] Exhibit A-1 of the Employer Contract lists Radhakrishnan's pre-approved days of unpaid leave as May 4, 2007 through May 29, 2007—a period of about three-weeks plus the Memorial Day holiday. *Joint Stipulated Ex.* 6 at 5. While the Employer Contract lists the end date of the third assignment as August 10, 2007, inexplicably, both parties note in their briefs that the end date was August 16, 2007. *Appellant's Br.* at 4; *Appellee's Br.* at 3.

[4] An RFE—"Request For Evidence"—is a formal response from USCIS that is issued when insufficient or suspicious data is found in a pending petition for an immigration benefit. RFEs are significant because, "[b]ased upon the response from the attorney or the petitioner, USCIS subsequently makes a decision to adjudicate or deny the petition." http://www.visajourney.com/wiki/index.php/Request_for_Evidence (last visited Dec. 17, 2013).

willing to take such a chance. The lawyer had advised to wait for interim EAD approval and has secured a USCIS inforpass appointment for it.

I will be leaving Michigan on July 31 to attend the USCIS appointment on Aug[ust] 3 in California.

I would like to state that I have been a hard-working employee of Access Therapies and I understand that this move is inconvenient for Access Therapies, but unfortunately this is a question of working on an illegal status (which the lawyer has confirmed) and so this is a step I am forced to take. As soon as I get my EAD renewal, I will promptly inform your office so that I can be assigned immediately and continue working on a legal status.

I have only 10 days left on this contract and the client facility is already aware of the need to replace my position. If Access intends to send another Therapist as my replacement, I shall do my best to help him/her take over.

As soon as I receive my interim EAD/renewed EAD card, I will inform your office so that Access Therapies can be able to find me a placement in California. (I am expecting my California license in a couple of weeks as well.

*Joint Stipulated Ex*. 8. The record contains no evidence that anyone from Access responded. On July 27, 2007, about two weeks before her third assignment was complete, Radhakrishnan, still without a valid EAD, stopped working for Eaton Care.

On August 3, 2007, Radhakrishnan attended an appointment at the USCIS office in California to obtain an Interim EAD. *Appellant's App*. at 64. Radhakrishnan was not issued an Interim EAD at the appointment; instead, she was directed to wait for the pending EAD renewal. While Radhakrishnan waited in California for news about the renewal, she received word from Vinluan's office that her Form I-485 application had been approved on August 21, 2007, and that she had been granted permanent resident status. Radhakrishnan later learned from the USCIS's online system that her EAD renewal had

been approved as of August 12, 2007; however, Radhakrishnan never received notice to that effect from either USCIS or Vinluan. *Tr*. at 88. Under the authority of either the EAD or her permanent resident status, Radhakrishnan was again entitled to work in any state for which she held a valid physical therapist license, which at that point was only Michigan.

On November 29, 2007, Access filed a Verified Complaint for Damages, contending that Radhakrishnan had breached the Contract when she stopped work on July 27, 2007. *Appellant's App*. at 9-17. More than a year later, Radhakrishnan received an email from Access on January 30, 2009, stating, "[W]e will be withdrawing your I-140 petition as you are not working with us anymore." *Joint Stipulated Ex*. 10. A CCS entry dated March 21, 2009 reveals that an alias summons was not served on the November 2007 complaint until March 2009. *Appellant's App*. at 2. Radhakrishnan filed her Answer and her Counterclaim on June 1, 2009. *Id*. at 18-21. Access filed its Answer to Defendant/Counter-Plaintiff's Counterclaim on July 21, 2009. *Id*. at 22-25. A bench trial was held on December 17, 2012, after which Radhakrishnan filed a Motion for Special Findings of Fact and Conclusions of Law. On December 20, 2012, the trial court entered Findings of Fact, Conclusions of Law and Judgment Entry in Favor of Plaintiff, concluding that Radhakrishnan had breached the Contract, and Access was entitled to recover damages in the amount of $32,237.60, plus costs and interest. Radhakrishnan filed her Motion to Correct Error on January 18, 2013, which the trial court denied on January 31, 2013. Radhakrishnan now appeals. Additional facts will be added where necessary.

## DISCUSSION AND DECISION

## I. Breach of Contract

Because the trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A), our standard of review is two-tiered. First, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *Briles v. Wausau Ins. Co.*, 858 N.E.2d 208, 212 (Ind. Ct. App. 2006). We will not disturb the trial court's findings or judgment unless they are clearly erroneous. *Walsh & Kelly, Inc. v. Int'l Contractors, Inc.*, 943 N.E.2d 394, 398 (Ind. Ct. App. 2011), *trans. denied*.

Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them. *Briles*, 858 N.E.2d at 212. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Id*. We will neither reweigh evidence nor judge the credibility of witnesses, but will consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id*. Although we defer to the trial court's factual findings, we evaluate questions of law de novo. *McCauley v. Harris*, 928 N.E.2d 309, 313 (Ind. Ct. App. 2010), *trans. denied*. "Construction of a written contract presents a pure question of law; accordingly, our review is de novo." *Gold v. Cedarview Mgmt. Corp.*, 950 N.E.2d 739, 742 (Ind. Ct. App. 2011) (citing *Harrison v. Thomas*, 761 N.E.2d 816, 818 (Ind. 2002)).

In its complaint, Access alleged that Radhakrishnan "materially breached the [C]ontract by, among other things, failing and refusing to work for the agreed duration of

eighteen (18) months." *Appellant's App.* at 10. Following a bench trial, the trial court made the following pertinent conclusions:

> 3. This is an action for breach of contract. To support a claim for breach of contract, the plaintiff must prove by a preponderance of the evidence that (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach. *Duncan v. Greater Brownsburg Chamber of Commerce, Inc.*, 967 N.E.2d 55, 57 (Ind. Ct. App. 2012)[, *trans. denied*].

> 4. The agreement dated May 5, 2006 is a valid and enforceable contract between Plaintiff, Access Therapies, Inc., on the one hand, and Defendant, Smita Radhakrishnan, on the other (the "Contract").

> 5. The Contract required Defendant to work for Access as a physical therapist for a period of 18 months beginning upon the start of work.

> 6. In exchange, the Contract required Access to provide Defendant with assignments, pay her for the work she performed, and provide a housing allowance while Defendant was on assignment.

> 7. Because Defendant commenced work for Access on August 29, 2006, Defendant was contractually obligated to work through February 29, 2008.

> 8. When Defendant stopped working on July 27, 2007, Defendant breached her Contract with Access.

> 9. It was Defendant's obligation to ensure that her EAD renewal paperwork was timely submitted so she could continue working on her Contract.

> 10. Accordingly, the Defendant's breach of the Contract was unexcused.

*Appellant's App.* at 66-67.

On appeal, Radhakrishnan agrees that the Contract was "a valid and enforceable contract between [herself] and Access Therapies." *Tr.* at 80. She also agrees that "the term of the agreement was for eighteen (18) months beginning on the start of work," which

9

meant that the Contract ran from August 29, 2006 to February 29, 2008. *Id*. at 80-81. Radhakrishnan, however, disagrees with the trial court's conclusion that she breached the Contract, contending, instead, that to continue working without valid federal working papers would have been "unlawful and put her at ultimate risk of deportation," and that it was Access's attorney who was responsible for obtaining and maintaining the work visa. *Appellant's Br*. at 15. Additionally, she contends that Access prevented her from completing the Contract when it only offered her jobs in California, a state Access knew she was not licensed to work in.

Access drafted the Contract, which was an agreement between a national company and a foreign national who was not represented by an attorney. All parties agree that Radhakrishnan would not have been legally allowed to work in the United States without a green card or a working visa. Therefore, an integral provision of the Contract was the manner by which Radhakrishnan, a foreign national, would obtain the proper documentation to be authorized to work for Access in the United States. In accordance with the rules of contract interpretation, any ambiguity in the contract is construed against the party who drafted it. *Time Warner Entm't Co., L.P. v. Whiteman,* 802 N.E.2d 886, 892 (Ind. 2004).

Here, the body of the Contract contained no terms addressing the key issue of whose responsibility it was to obtain and maintain proper documentation for Radhakrishnan. While recitals do not ordinarily form a part of the agreement, they shed light on the intention of the parties and may be referred to "in determining the intent of the parties

10

where its operative parts are ambiguous." *Ohio Valley Gas, Inc. v. Blackburn*, 445 N.E.2d 1378, 1383 (Ind. Ct. App. 1983). Lacking guidance from the body of the Contract, we turn to the Recitals.

> The Recitals of the Contract provided as follows:
>
> Employee is a foreign national who has immigrated to the United States and wishes to be employed as a professional Physical Therapist with Employer. In order to work in the United States as a PT, Employee must have a valid Employment–based Visa. Employer shall sponsor the Employee for an Employment-based Visa with USCIS, as well as employment with Employer.
>
> Employer is desirous of hiring Employee as a full time [e]mployee to work in Employer's Client facilities as a PT [physical therapist] for a period of not less than 18 MONTHS after Employee receives his/her work permit. In order to help the Employee to accomplish those goals, Employer will complete and submit to the USCIS the Employee's petition paperwork (I-140 Petition) and other necessary documents, employ Employee, and for this and other consideration, receipt of which is hereby acknowledged, Employee hereby agrees to these additional terms and conditions of [e]mployment.

*Appellant's App*. at 14. The above language conveys that, while Radhakrishnan wished to work for Access, it was Access who wanted to hire Radhakrishnan as a full time employee for a period of *not less than eighteen months* after Radhakrishnan received her work permit. The Recitals continued that, in order to help Radhakrishnan accomplish the goal of working for Access for eighteen months, "Employer will complete and submit to the USCIS the Employee's petition paperwork (I-140 Petition) *and other necessary documents . . . .*" *Id*.

Access acknowledges that it agreed to arrange for the initial working papers. As such, on June 22, 2006, Access's attorney, Vinluan, filed with the USCIS: (1) an Immigration Petition for Alien Worker on Form I-140; (2) an Application to Adjust to

11

Permanent Resident Status on Form I-485; and (3) an Application for Employment Authorization on Form I-765. *Joint Stipulated Ex.* 4 at 1-3. The parties disagree, however, regarding whose responsibility it was to renew the documents required to enable Radhakrishnan to legally work.

Radhakrishnan contends that she provided Vinluan with the appropriate information in a timely fashion. Access agrees that it put Radhakrishnan in touch with Vinluan to renew her working papers, but, attempting to distance itself from Vinluan, Access contends that Vinluan was not working on Access's behalf. We are not persuaded. During the trial, Dhani himself admitted that Vinluan was Access's attorney when he made the following statements:

> [Defense Attorney]: Okay. . . . [W]ith regard to the defendant and other persons in her position, was [Vinluan] acting for the business when he did the things he did for them?
> [Dhani]: Just like any attorney would do that you know he works as an outside attorney for us you know we would pay for his fee for his work.
> [Defense Attorney]: For the business?
> [Dhani]: Yes.
> [Defense Attorney]: Okay. Now, he's operating for the business and did you then consider him to be your attorney?
> [Dhani]: . . . [I]f we are paying his fee I'm hoping that he's our attorney.

*Tr.* at 47.

Here, the Contract does not specify whose obligation it was to renew the EAD; however, the Recitals state, "Employer will complete and submit to the USCIS the Employee's petition paperwork (I-140 Petition) and *other necessary documents.*" *Appellant's App.* at 14. We find that the evidence does not support the trial court's

12

conclusion that it was Radhakrishnan's obligation to ensure that her EAD renewal paperwork was timely submitted so she could continue working on her Contract." *Appellant's App*. at 67. Interpreting the terms of the Contract against the drafter, as we must, we conclude that the obligation to ensure the timely renewal of the EAD fell to Access as a precondition to Radhakrishnan's continued employment. Because it was illegal for Radhakrishnan to work without a renewed EAD, we find that, Radhakrishnan did not breach the contract when she refused to work from July 27 through the time she learned that she could, again, legally work in the United States.

That leaves the question of whether Radhakrishnan breached the Contract at any time after July 27, 2007 but before Access filed its complaint in November 2007. On August 8, 2007, prior to Radhakrishnan having obtained her working papers, Access Recruiter Suresh Kammath ("Kammath") emailed Radhakrishnan saying, "Please let me know about your license in CA. I have a couple of openings there." *Joint Stipulated Ex.* 9. The next day, Radhakrishnan responded, "I have applied but haven't received my CA license yet. The process usually takes a few weeks if it goes smoothly. Once I receive it, I will inform you promptly." *Id*. On October 16, 2007, Kammath again emailed Radhakrishnan, saying, "Any updates on your CA license?" *Id*. Radhakrishnan responded the next day, "I haven't received the license yet. There were some further requirements they had, which I am in the process of submitting." *Id*. In response to a telephone call from Access employee Advhi Jain ("Jain"), Radhakrishnan emailed him on November 13, 2007 to say that she was awaiting her California license, but that she would inform Access

"once [she] received it." *Id*. Jain responded, "[P]lease keep us updated so that we could have something in hand for you." *Id*. In the emails, Access did not offer Radhakrishnan any positions in Michigan. Between July 27, 2007, the last day Radhakrishnan worked for Eaton Care, and February 29, 2008—the end of the Contract—Radhakrishnan did not receive any pay nor was she provided any housing or expenses. Access filed its breach of contract action on November 29, 2007, thus terminating the Contract.

Access knew that Radhakrishnan was awaiting her California license. It appeared to be taking longer than expected, and yet, Access voiced no concerns nor did it register any complaints.[5] Pursuant to the Contract, it was not Radhakrishnan's responsibility to obtain work; instead, Access was the one who contracted with care centers to provide them with Radhakrishnan's physical therapy services. Furthermore, Radhakrishnan could not have known that her lack of work was being deemed to be a breach of contract. Under the Contract, Radhakrishnan was not obligated to work each week during the eighteen months. In fact, Radhakrishnan was idle for fifteen weeks between the end of her first assignment and the start of her second even though she made efforts to be assigned.[6] Based on this evidence, we cannot say that Radhakrishnan breached her Contract with Access.

---

[5] Radhakrishnan's California physical therapist license was not approved until September 8, 2008, about seven months after Radhakrishnan's February 29, 2008 obligation under the Contract would have expired.

[6] On October 31, 2006, Radhakrishnan both called and sent an email to Access Recruiter Kammath, asking him about a position in Ann Arbor, Michigan, which Kammath had spoken to her about. No assignment arose from this inquiry. On November 21, 2006, Radhakrishnan sent an email to Kammath to alert him about a thirteen-week assignment in a skilled nursing facility in Three Rivers Michigan. Again, no assignment came of this lead. Access did not offer Radhakrishnan another assignment until January 23, 2007—more than fifteen weeks after she had completed her first. *Joint Stipulated Ex.* 7.

14

Therefore, we reverse the trial court's award of damages in the amount of $32,237.60 plus costs and remand for action consistent with this opinion.

## II. Counterclaim

Radhakrishnan filed a counterclaim against Access seeking costs and attorney fees. Radhakrishnan contends that the trial court erred in dismissing her counterclaim for lack of evidence. In essence, Radhakrishnan contends that the trial court abused its discretion in denying her request for attorney fees and costs because Access's suit was frivolous. We find that the trial court did not abuse its discretion.

Radhakrishnan maintained that Access's complaint contained averments that were known to be untrue and, as such, the claim was frivolous under Indiana Code section 34-52-1-1. Specifically, Radhakrishnan maintained that the following statements were untrue: (1) that Access paid for Radhakrishnan's certification as a physical therapist; (2) that Access paid for Radhakrishnan's license in Michigan; (3) that Radhakrishnan immigrated to the United States seeking employment opportunities; (4) that Radhakrishnan refused to work; and (5) that the cause of action against Radhakrishnan would involve more than $10,000. *Appellant's App*. at 20-21. The trial court determined that because the counterclaim was "asserted in such general terms," evidence pertaining to the counterclaim would be heard and considered throughout the trial. *Tr*. at 17.

At the close of trial, the trial court dismissed the counterclaim and made the following findings:

> Okay. The Court is going to find for the plaintiff and against the defendant on the defendant's counterclaim. There's literally been no evidence presented by

15

the defendant in support of the counterclaim. Now, I understand there's been responses by the defendant to plaintiff's allegations. Understand that perfectly, but the defendant would have the burden of proof on her allegation that, and I'm reading from her counterclaim that the claims are frivolous, unreasonable, groundless, and made in bad faith and I have no evidence to support that allegation.

*Id.* at 110. As such, the trial court effectively denied Radhakrishnan's request for attorney fees and costs.

"'The trial court's decision to grant or to deny attorney[] fees will not be disturbed absent an abuse of discretion." *Dunson v. Dunson*, 769 N.E.2d 1120, 1127 (Ind. Ct. App. 2002) (quoting *Kovenock v. Mallus*, 660 N.E.2d 638, 643 (Ind. Ct. App. 1996), *trans. denied*). The trial court found that no evidence was presented to support Radhakrishnan's counterclaim. We agree. Radhakrishnan's claims—questioning the veracity of statements regarding who paid for licenses and fees and whether Radhakrishnan immigrated seeking employment—were of no moment in the determination of whether Radhakrishnan breached the Contract. Additionally, the question of whether Radhakrishnan refused to work, and if so what damages should be imposed, were questions properly before the trial court on the breach of contract claim. The trial court did not abuse its discretion in dismissing Radhakrishnan's counterclaim requesting attorney fees and costs.

Affirmed in part, reversed in part, and remanded with instructions.

RILEY, J., and ROBB, J., concur.

16